Laramore, Judge,
dissenting:
I am of the opinion that the transaction in this case was not equivalent to a dividend. The reason I think this is not equivalent to a dividend is based on the following: Plaintiff J. W. Neff was the sole stockholder of the J. W. Neff Laboratories, Inc. This corporation needed additional operating capital. It could not borrow money from the banks; no purchaser would buy stock directly from Mr. Neff since the proceeds of the sale would inure to Neff rather than to the corporation. Hence, Mr. Neff decided to sell to the company 47 of the 99 shares he owned at about half of the book value of the shares. This was for the purpose of permitting the corporation to resell these, which it thought it could do at a profit, and thereby secure the capital necessary to the continuation of the corporation. The corporation did resell 38 shares over a period of between 9 to 12 months, and realized a profit greatly in excess of what the corporation had paid Mr. Neff. The fact that the resale was accomplished over a period of some 9 to 12 months, in my opinion, would not change the complexion of the transaction. Obviously the stock could not be immediately sold at the profit eventually realized. The 9- to 12-month period necessary to complete the transaction should not, and could *331 not, as later demonstrated, alter the situation to the extent of making the sale equivalent to a dividend.
Thus, when the transaction is viewed as a whole, the entire purpose had been accomplished; i.e., the gathering of additional money to sustain the future operations of the corporation. I realize that the presence of a valid business purpose alone is not controlling. Holsey v. Commissioner, 258 F.2d 865, 869; Northrup v. United States, 240 F.2d 304, 307. However, in this situation, Mr. Neff, after the sale, had a quite different interest than before. This being true, the money and property given him by the corporation in exchange for his stock could not be considered the equivalent of a dividend. When a person receives a dividend, his interest in the company remains exactly the same. This is not the case here. After the entire transaction, Mr. Neff’s interest in the company was 56 percent as opposed to his 99 percent stock ownership before.
It is true that section 302(b) (C) (i) contains the language “immediately after the redemption.” However, the fact that the stock was sold by the corporation over a period of months would not, in my opinion, have the effect of bringing into play section 302 (b) (2) of the 1954 Code. Section 302 (b) (1) of the 1954 Code was a re-enactment of section 115(g) of the 1939 Code and reiterated the essential equivalent to a dividend test. The prior law on the subject was preserved, as is disclosed by the legislative history of section 301(b) (1).
Senate Eeport No. 1622, 83rd Congress, 2nd session, in discussing subsection (b) of section 302, states:
* * * In lieu of the approach in the House bill, your committee intends to revert in part to existing law by making the determination of whether a redemption is taxable as a sale at capital gains rates or as a dividend at ordinary income rates dependent, except where it is specifically provided otherwise, upon a factual inquiry.
* # # sf: *
Subsection (b) of Section 302 states three conditions in paragraphs (1), (2), (3) and (4), the satisfaction of any one of tohich will result in the treatment of the redemption as a distribution in full or part payment in exchange for the stock. [Italic supplied]
*332 Paragraph (1) of subsection (b) provides that subsection (a) will apply if the redemption is not essentially equivalent to a dividend.
The test intended to be incorporated in the interpretation of paragraph (1) is in general that currently employed under section 115(g) (1) of the 1939 Code. Your committee further intends that in applying this test for the future that the inquiry will be devoted solely to the question of whether or not the transaction by its nature may properly be characterized as a sale of stock by the redeeming shareholder to the corporation. * * *.
From the above language, it seems clear that the tests under the 1939 Code are still pertinent to cases arising under section 302(b) (1) of the 1954 Code and that the remaining subsections (2), (3), and (4) of said section serve not as restrictions on the scope of subsection (1), but as additional areas in which capital gains treatment will be permitted. This was likewise held in the case of Radnitz v. United States, 187 F. Supp. 952, 956.
Having met the test of section 302(b) (1), i.e., that the redemption was not equivalent to a dividend, the intent of Congress as shown by Senate Keport No. 1622, supra, was that the amount realized on the stock redemption should receive capital gains treatment.
For the above reasons, I believe plaintiffs are entitled to recover in this action.
Davis, Judge, took no part in the consideration and decision of this case.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Robert K. McConnaughey, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiffs, J. W. Neff and Elizabeth A. Neff, are husband and wife residing at 2121 Edgewood Avenue, Easton, Pennsylvania.
2. Plaintiffs timely filed an individual income tax return on Form 1040, for the calendar year 1954, with the District Director of Internal Revenue at Scranton, Pennsylvania (hereafter referred to as the “District Director”). That return did not report the transfer, in 1954, by J. W. Neff *333 to J. W. Neff Laboratories, Inc., for $19,035, of 47 shares of stock in J. W. Neff Laboratories, Inc., or any gain or loss thereon. Mr. Neff explained the failure to report the transaction on the ground that he thought it had not involved any profit.
3. On or about April 23,1957, following an audit of plaintiffs’ 1954 income tax return by an agent of the Internal Revenue Service, plaintiffs filed with the District Director an amended individual income tax return for 1954 on Form 1040. In the amended return, plaintiffs reported $6,133.04 of the $19,035 referred to in finding 2 as a long-term capital gain on assets held for more than 6 months.
4. On or about October 23, 1957, plaintiffs executed and filed a Waiver of Restrictions on Assessment and Collection of Deficiency in Tax, Form 870. Additional income tax of $9,829.98 for 1954 was thereafter assessed and was paid by plaintiffs on November 25, 1957, together with $1,523.65 of interest. The additional assessment was based upon the ground that the $19,035 was essentially equivalent to a taxable dividend and was not, for tax purposes, a sale of a capital asset.
5. On or about May 23,1958, plaintiffs filed with the District Director, on Form 843, a claim for refund for 1954 of $9,829.98 with interest as provided by law. In the claim for refund, plaintiffs claimed that the purchase of the 47 shares by the J. W. Neff Laboratories, Inc. was motivated solely by business considerations and that the distribution to plaintiff J. W. Neff pursuant thereto was not essentially equivalent to a dividend, but rather was a sale by him of a capital asset held for more than 6 months, and accordingly constituted a capital transaction entitling plaintiffs to long-term capital gain treatment.
6. By registered letter dated January 13,1959, the Commissioner of Internal Revenue (hereafter referred to as the “Commissioner”) notified plaintiffs of the disallowance of $8,702.07 of the claim for refund, and refunded to plaintiffs $1,302.74 with interest thereon of $80.95.
7.J. W. Neff Laboratories, Inc., originally a consulting engineering firm, was incorporated on May 24, 1938, in Delaware with an authorized capital of 500 shares of $10 *334 par value common stock. The original stock issued, 100 shares of the 500 authorized, was owned as follows:

Stockholder Number of Shares

John Stead_ _ 51
J. W. Neff_ - 47
Elizabeth A. Neff_ _ 1
O. Oakley McFadden. _ 1
Total_ 100
8. On December 22, 1938, J. W. Neff Laboratories, Inc. (hereafter sometimes referred to as the “company”) was incorporated in Pennsylvania. The authorized capital, the stockholders, and stockholdings in the Pennsylvania corporation remained the same as stated in finding 7 in respect of the original Delaware corporation. The Delaware franchise was terminated on June 22, 1939.
9. No further transactions in the company’s stock occurred until September 1949, when J. W. Neff purchased for $14,000, from the estate of John Stead the 51 shares formerly owned by Mr, Stead. Of the $14,000 purchase price, Mr. Neff paid $6,000 out of his own funds and borrowed the balance of $8,000 from the company, giving his personal note as evidence of the indebtedness. On September 15, 1950, Mr. Neff borrowed an additional $5,000 from the company, bringing his total indebtedness in the form of notes payable to the company to $13,000.
10. After the transaction described in finding 9, the company’s stock was owned as follows:

Stockholder Number of Shares

J. W. Neff (President)_ 98
Elizabeth A. Neff (his wife)_ 1
C. Oakley McFadden_ 1
Total_ 100
11.On September 30, 1954, J. W. Neff transferred 47 of his 98 shares to the company for $19,035, which was paid by (a) cancellation of the $13,000 in notes payable by Mr. Neff to the company, described in finding 9, (b) cancellation of a loan receivable representing cash advances to Mr. Neff totaling $776.55, (c) transfer to Mr. Neff of title to an automobile owned by the company and valued at $2,434.11, and *335 (d) creation of an open account payable to Mr. Neff in the amount of $2,824.34..
12.The following table shows, for the periods indicated, the company’s net profits and the dividends paid:

Net Profit Near After Taxes Dividends Paid

1944_ $3, 817.54 None
1945_*(9,429.00) None
1946_ 14,124.42 None
1947_ 7, 650.40 None
1948_ 16, 888.43 None
1949_ 13, 660.18 $3,000
1950- 24,893.04 None
1951- 3,614. 55 None
1952- 3, 618.55 None
1953- (11,934.83) None
1954- (11, 345. 63) None
* ( ) indicates loss
The 1949 dividend had been required by the executors of the John Stead estate as a condition precedent to the sale of its 51 shares of stock to J. W. Neff, as described in finding
9.
13. About 1946, the company, which formerly had been engaged in designing devices for other companies, decided to engage in the production of phonograph biscuits (the biscuit shaped lump of material from which phonograph records are made). It did not have adequate financial resources for such a business. Arrangements were made whereby Binney & Smith, Inc., with which the company had previous business contacts, agreed to rent the company a building in Stockertown, Pennsylvania and to finance its inventory requirements as well as its invoicing and other operations. For these services, Binney & Smith received a commission. This relationship continued until about 1951, when the company assumed the direct payment of all payroll, Subsequently, the company purchased the Stocker-town building from Binney & Smith, agreeing to pay the purchase price on an installment basis. Through the entire period from 1946 to late 1954, Binney & Smith financed the company’s inventory.
14. Between 1950 and 1954, the phonograph record business (the chief source of the company’s sales) was subjected *336 to increasingly severe competition and, as shown in finding 12, profits declined.
15. By the beginning of 1954, the company owed Binney & Smith about $250,000, which included the inventory obligation, the unpaid balance on the sale of the Stockertown building, and an amount due on open account. Binney & Smith then decided to terminate, on the best terms possible in the circumstances, the arrangement whereby it was financing the company’s inventory.
Various approaches to this problem were considered by Binney & Smith’s Board and its legal counsel, including acceptance of stock of the company in part or full payment of the company’s debt to Binney & Smith, and placing the company in bankruptcy and obtaining whatever could be salvaged under the hammer.
16. Mr. Neff was informed of Binney & Smith’s decision to withdraw from its arrangements for financing the company. In an effort to obtain funds with which to comply with Binney & Smith’s demands, and to obtain working capital to be used in part to finance a new venture into the manufacture of road markers, the company attempted unsuccessfully to borrow funds at two banks in Easton, Pennsylvania.
17. The company then proposed to Binney & Smith that it accept company stock in payment for the indebtedness owing to it by the company.
18. About this time, John Schaible, a local acquaintance of Mr. Neff, having learned of the refusal of the banks to lend money to the company, suggested that stock of the company might be sold locally to raise the funds needed. The possibility of a public financing was also discussed. The company’s Board of Directors concluded that the only answer to the company’s difficulties was the sale of stock locally to raise the money needed for working capital and to repay the obligations owing to Binney & Smith.
19. The company’s counsel, who had handled its incorporation in 1938, was consulted. According to Mr. Neff’s testimony, he advised that in order to carry out the proposed program, Mr. Neff would have to sell some of his stock to the company so that it would have stock available to sell to others.
*337 20. Mr. Neff testified that he was reluctant to acquiesce in the proposal that he sell some of his stock because he had faith in the future of the company and desired to participate as fully as possible in its expected growth. According to his testimony, he suggested that if it was necessary for him to part with some of his shares he would prefer to sell them directly to the prospective buyers, but the purchasers opposed this suggestion on the ground that under such an arrangement he, rather than the company, would receive the money, and the purchasers would have no assurance that the funds he received would be placed in the company.
21. Incredible as it may seem, especially in view of Mr. Neff’s professed extreme reluctance to part with any of his shares, the uncontradicted evidence in this record is that neither the lawyer who had incorporated the company and had acted as its counsel for the entire period between its organization and the date when it purchased Mr. Neff’s stock, nor Mr. Neff, who was one of the incorporators of the company and had been its dominant officer and stockholder throughout its history, gave any consideration to the fact that the company already had 500 shares authorized, of which only 100 had been issued. The existence of 400 authorized but unissued shares was evident not only from the basic corporate documents, readily and continuously available to the officers and directors of the corporation and to its counsel, but, through a simple computation, from information stated on the face of each stock certificate. Obviously, the company’s need for new capital in 1954 could have been satisfied by the sale of authorized but unissued shares. Even the possible but unnecessary alternative of increasing the authorized capital sufficiently to provide additional shares for direct sale apparently was not considered.
Instead, according to Mr. Neff, he finally was convinced that he had to sell some of his stock to the company if it were to avoid financial ruin, and reluctantly he agreed to do so. It was the choice of this patently unnecessary alternative as a means of providing the company with stock to be sold to procure the funds needed to pay off its obligations to Binney & Smith and to provide it with working capital to finance its venture into the manufacture of road markers, *338 that led to Mr. Neff’s transfer of 47 of his 98 shares of the company’s stock to the company on September 30, 1954, as described in finding 11.
The sale price was $405 per share. The book value per share at the time of sale was $852.47. At the time of the sale, Mr. Neff was receiving an annual salary of $25,000 from the company and an annual salary of $14,487.77 from Binney & Smith. The company automobile was included in the transaction because, according to Mr. Neff, he considered it improper for him to continue to une it as a company automobile with potential new stockholders about to participate in the ownership of the company.
22. On August 31, 1954, the company’s checking account contained $9,684.60; on September 30,1954, it had a balance of $10,741.23. On both of these dates, the company’s ratio of current assets to current liabilities was slightly less than one to one. Its balance sheet, however, showed an earned surplus of $84,247.45, as of September 30,1954.
23. Between February 24,1955, and January 11, 1956, the company sold 38 of the 47 shares of treasury stock it acquired through its purchase of Mr. Neff’s shares, at varying prices, all much higher than the price it had paid him for the stock. The remainder of the treasury stock was unsold because no buyers could be found. The increased prices at which the treasury stock was sold were said to have been based on a professional appraisal.
24. The following table shows the sales of treasury stock made by the company between February 24,1955, and January 11, 1956, the dates of sale, the number of shares sold, the sale prices, and the prices per share:

*339 25. As a result of Mr. Neff’s transfer of 47 of his shares to the company and the company’s subsequent sale of most of these shares to others, Mr. Neff’s proportionate interest in the company was, of course, materially changed.
26. Between the date of its incorporation in 1938 and 1954, the company paid no stock dividends and did not split its stock.
27. The company paid no cash dividends during the years 1950 to 1954, inclusive — in the earlier years because its management wanted to retain the earnings in the business, and in the later years because its management believed that in view of its losses in those years, it could not afford to pay cash dividends. In 1955, however, the company earned $32,448.67 after taxes, and paid $11,340 in dividends; and in 1956, it earned $17,905.37 after taxes, and paid $19,110 in dividends.
28. The examination of plaintiffs’ 1954 Federal income tax return was conducted early in 1957. By that time, as appears from finding 26, the crisis present in 1954 had passed. When the agent questioned Mr. Neff’s treatment of the transaction in his 1954 return, Mr. Neff suggested to the agent that he might reacquire the stock and reassume his stock position with the company as it had existed before the challenged transaction. The record does not disclose the terms on which he proposed to undo the 1954 transaction. Nor does it appear that any such proposal was ever made to the corporation or to the persons who had purchased the stock.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiffs are not entitled to recover, and the petition is, therefore, dismissed.